FILED
2012 Jul-11  AM 10:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

ELIZABETH ANN MONDRAGON,     )
         )
     Plaintiff,     )
         )
     v.     )     CIVIL ACTION NO. 11-G-2863-NE
         )
MICHAEL J. ASTRUE,     )
Commissioner of Social Security,     )
         )
     Defendant.     )
         )
         )

## MEMORANDUM OPINION

The plaintiff, Elizabeth Ann Mondragon, brings this action pursuant to the provisions of section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration (the Commissioner) denying her application for Social Security Disability benefits.  Plaintiff timely pursued and exhausted her administrative remedies available before the Commissioner.  Accordingly, this case is now ripe for judicial review under 205(g) of the Social Security Act (the Act), 42 U.S.C. §405(g).

### STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied.  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).  To that end this court "must scrutinize the record as a whole to determine if the decision reached

is reasonable and supported by substantial evidence." <u>Bloodsworth</u>, at 1239 (citations omitted).  Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." <u>Bloodsworth</u>, at 1239..

## STATUTORY AND REGULATORY FRAMEWORK

In order to qualify for disability benefits and to establish his entitlement for a period of disability, a claimant must be disabled.  The Act defines disabled as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(I).  For the purposes of establishing entitlement to disability benefits, physical or mental impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

In determining whether a claimant is disabled, Social Security regulations outline a five-step sequential process. 20 C.F.R.§ 404.1520(a)-(f).  The Commissioner must determine in sequence:

(1)     whether the claimant is currently employed;

(2)     whether she has a severe impairment;

(3)     whether her impairment meets or equals one listed by the Secretary;

(4)     whether the claimant can perform her past work; and

(5)     whether the claimant is capable of performing any work in the national economy.

Pope v. Shalala, 998 F.2d 473, 477 (7th Cir.1993); accord McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986).  "Once the claimant has satisfied Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have a listed impairment but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job."  Pope at 477; accord Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995).  The Commissioner further bears the burden of showing that such work exists in the national economy in significant numbers.  Id.

        In the instant case,  ALJ Patrick R. Digby determined the plaintiff met the first two tests, but concluded that while she has an impairment or impairments considered "severe," her impairments do not meet or equal in severity any impairment set forth at 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. 11, 15].   The ALJ found the plaintiff unable to perform her past relevant work.  Once it is determined that the plaintiff cannot return to her prior work, "the burden shifts to the [Commissioner] to show other work the claimant can do."  Foote, at 1559.  Furthermore, when, as is the case here, a claimant is not able to perform the full range of work at a particular exertional level, the Commissioner may not exclusively rely on the Medical-Vocational Guidelines (the grids).  Foote, at 1558-59. The presence of a non-exertional impairment, pain, also prevents exclusive reliance on the grids.  Foote, at 1559.  In such cases "the [Commissioner] must seek expert vocational testimony."  Foote, at 1559.

## THE STANDARD WHEN THE CLAIMANT TESTIFIES SHE SUFFERS FROM DISABLING PAIN

In this circuit, "a three part 'pain standard' [is applied] when a claimant seeks to establish disability through his or her own testimony of pain or other subjective symptoms." Foote, at 1560.

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

Foote, at 1560 (quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991). In this circuit medical evidence of pain itself, or of its intensity, is not required.

> While both the regulations and the Hand standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself. Thus under both the regulations and the first (objectively identifiable condition) and third (reasonably expected to cause pain alleged) parts of the Hand standard a claimant who can show that his condition could reasonably be expected to give rise to the pain he alleges has established a claim of disability and is not required to produce additional, objective proof of the pain itself. See 20 CFR §§ 404.1529 and 416.929; Hale at 1011.

Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1215 (11th Cir. 1991) (parenthetical information omitted) (emphasis added). Furthermore, it must be kept in mind that "[a] claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability." Foote at 1561. Therefore, if a claimant testifies to disabling pain and satisfies the three part pain standard, she must be found disabled unless that testimony is properly discredited.

When the Commissioner fails to credit a claimant's pain testimony, he must articulate reasons for that decision.

> It is established in this circuit that if the Secretary fails to articulate reasons for refusing to credit a claimant's subjective pain testimony, then the Secretary, as a matter of law, has accepted that testimony as true. Implicit in this rule is the requirement that such articulation of reasons by the Secretary be supported by substantial evidence.

Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987). Therefore, if the ALJ either fails to articulate reasons for refusing to credit the plaintiff's pain testimony, or if his reasons are not supported by substantial evidence, the pain testimony of the plaintiff must be accepted as true.

## THE IMPACT OF A VOCATIONAL EXPERT'S TESTIMONY

It is common for a vocational expert ("VE") to testify at a claimant's hearing before an ALJ, and in many cases such testimony is required. The VE is typically asked whether the claimant can perform his past relevant work or other jobs that exist in significant numbers within the national economy based upon hypothetical questions about the claimant's abilities in spite of his impairments. "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999).

If the claimant is unable to perform his prior relevant work the burden shifts to the Commissioner to establish that he can perform other work. In such cases, if the vocational expert testimony upon which the ALJ relies is based upon a hypothetical

question that does not take into account all of the claimant's impairments, the

Commissioner has not met that burden, and the action should be reversed with

instructions that the plaintiff be awarded the benefits claimed.  This is so even if no other

hypothetical question is posed to the VE.  See Gamer v. Secretary of Health and Human

Services, 815 F.2d 1275, 1280 (9th Cir. 1987)(noting that when the burden is on the

Commissioner to show the claimant can do other work, the claimant is not obligated to

pose hypothetical questions in order to prevail).  However, it is desirable for the VE to be

asked whether the claimant can perform any jobs if his subjective testimony or the

testimony of his doctors is credited.  Such a hypothetical question would allow disability

claims to be expedited in cases in which the ALJ's refusal to credit that testimony is

found not to be supported by substantial evidence.

       In Varney v. Secretary of Health and Human Services, 859 F.2d 1396 (9th

Cir. 1987), the Ninth Circuit adopted the Eleventh Circuit rule which holds that if the

articulated reasons for rejecting the plaintiff's pain testimony are not supported by

substantial evidence, that testimony is accepted as true as a matter of law.  Id at 1401.

The court noted that "[a]mong the most persuasive arguments supporting the rule is the

need to expedite disability claims."  Id.  If the VE is asked whether the claimant could

perform other jobs if his testimony of pain or other subjective symptoms is accepted as

true, the case might be in a posture that would avoid the necessity of a remand.  As

Varney recognized, if the VE testifies the claimant can perform no jobs if his pain

testimony is accepted as true, the only relevant issue would be whether that testimony was properly discredited.  Id.  This also holds true for the opinions of treating physicians.

## DISCUSSION

ALJ Digby found that the plaintiff has the following severe impairments: peripheral neuropathy; chronic obstructive pulmonary disease; allergic rhinitis; gastroesophageal reflux disease; and hypertension. [R. 11].  However, he found that the plaintiff's anxiety, irritable bowel syndrome, mild sensorineural hearing loss and eosinophilic esophagitis are non-severe impairments, "as they do not significantly affect the claimant's ability to perform work related activity."  Id.

The plaintiff's treating physician, R. Charles Morley, M.D., examined her on June 28, 2007.  On examination, the plaintiff had "signs of peripheral nerve entrapment in her left leg at three sites with positive Tinel's signs[1] at all three sites and asymmetric [Pressure Specified Sensory Device, "PSSD"] evidence of sensory polyneuropathy of the left lower extremity." [R. 215](footnote added).  On July 26, 2007, the plaintiff underwent a three level decompression and neurolysis of the peripheral nerves of her left leg. [R. 219-220].  On August 9, 2007, although the plaintiff had noted improvement of tenderness and tingling in her left foot, Dr. Morley still diagnosed neuropathy and foot and ankle pain. [R. 212].

---

[1] Tinel's sign is "a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve.  It indicates a partial lesion or the beginning regeneration of the nerve." Dorland's Illustrated Medical Dictionary 1527 (28th Ed. 1994).

On March 4, 2008, the plaintiff returned to Dr. Morley, who noted:

> She is no better clinically really.  She still has sitting [leg] burning and pain in her feet when she gets up and walks around and the PSSD studies done on January 9, 2008, show improvement in two point discrimination and not much change in one point discrimination on the left leg and in view of her rather disappointing clinical results are probably unchanged from preop.  I told her at least we could say that she was not worsening as far as her sensation goes and I apologized that she was not feeling better from the surgery.  I do not think that continued surgery on the opposite side would be indicated or substantiated by the result she has had thus far and she agrees.

[R. 210].  She returned to Dr. Morley on June 9, 2008, after twisting her left ankle three weeks earlier, complaining of increased and different pain in her left foot and leg. [R. 209].  On examination, Dr. Morley noted "[t]enderness everywhere I touch, including in the plantar aspect of the forefoot." Id..  In August 2008, the plaintiff quit her soldering job because her leg pain would not allow her to stand.[2]

On February 16, 2009, John R. Roberts, M.D., a pain management doctor, performed a left L5 and S1 selective nerve root block in an attempt to relieve the plaintiff's low back and left lower extremity pain. [R. 422].  On February 23, 2009, she was referred to Brian M. Scholl, M.D., an orthopedist, who found, "She does have some lumbar pain with flexion extension of the lumbar spine.  Her straight leg raise is positive on the left for radicular pain in the posterolateral thigh and medial calf region as well as into the dorsum of the foot." [R. 375][3]. Dr. Scholl diagnosed a possible acute compression

---

[2]  The plaintiff testified that her soldering job required her to stand 10 to 12 hours a day. [R. 35].

[3]  A positive SLR (Straight Leg Raise test) is recognized by the regulations as a
(continued...)

fracture in the T8 region, and lumbar pain with left leg radiculopathy "longstanding." [R. 376].  On March 4, 2009, another treating physician, James G. Chambers, III, M.D., diagnosed claudication[4] in her legs and chronic pain. [R. 446].  Results of an arterial Doppler ultrasound were normal. [R. 447]. On April 2, 2009, the plaintiff was referred to Eric R. Beck, M.D., Ph.D., for an electrodiagnostic evaluation, which showed mild irritability "in the left anterior tibialis and peroneus longus which may be related to the patient's previous surgery at the left fibular head presumably a release of the left common peroneal nerve." [R. 407].  Dr. Beck diagnosed a mild lesion of the left peroneal nerve, but stated:

> Given the marked quad atrophy and history of instability, I would like her to return to physical therapy.  I do not know if this will make a great deal of change in her pain situation and I have encouraged her to continue with Dr. Roberts, her pain physician.  I will see her back in three weeks.

[R. 405].  On May 18, 2009, Dr. Roberts performed another nerve root block. [R. 419]. At a follow up visit with Dr. Beck on June 15, 2009, the plaintiff had completed 15 sessions of therapy with improvement of balance "but she still has left leg pain." [R. 399]. Dr. Beck noted that the plaintiff had received maximum benefit from physical therapy.

_____

[3] (...continued)
clinically appropriate test for the presence of pain and limitation of motion of the spine. (See Listing 1.00(B), ¶5)  The SLR test is also known as Lasègue's sign:  "In sciatica, flexion of the hip is painful when the knee is extended, but painless when the knee is flexed.  This distinguishes the disorder from disease of the hip joint."  Dorland's Illustrated Medical Dictionary 1525 (28th Edition).

[4] Claudication means "limping or lameness," and when it is neurogenic in nature is "accompanied by pain and paresthesias in the back, buttocks, and legs that is relieved by stooping. . . ."  Dorland's Illustrated Medical Dictionary 338 (28th Ed. 1994)

[R. 400].   On July 29, 2009, Dr. Chambers diagnosed a left peroneal nerve injury. [R. 444].

Dr. Roberts performed a left superficial perineal nerve block at the fibular head on August 5, 2009, indicated by peripheral perineal neuropathy. [R. 538].  On August 12, 2009, the plaintiff was examined by Jack W. Moore, M.D., who noted "some paresthesias into the [left] foot on the plantar aspect as well as the dorsum," in addition to "posterior tenderness as well in the knee at the politeal fossa and some lateral retinacular tenderness." [R. 426].  A left knee meniscal tear and left knee internal derangement of the lateral meniscus and knee pain was suspected, although an MRI of the left knee was essentially normal. [R. 425-426].

Despite the plaintiff's taking Lortab 7.5 and naproxen, on November 19, 2009, she still rated her pain at an eight out of 10. [R. 534].  Dr. Roberts performed another left peroneal nerve block at the fibular head, which temporarily resolved her pain. [R. 534-535].  A January 18, 2010, treatment note of Dr. Beck indicated the plaintiff was attending another course of physical therapy with improvement, although she still complained of "persistent pain." [R. 470]. However, by February 15, 2010, Dr. Roberts attempted yet another left peroneal nerve block because of left lower extremity neuropathic pain. [R. 532].  On June 3, 2010, the plaintiff returned to Dr. Roberts with nine out of 10 pain in her left knee and foot. [R. 514].  Dr. Roberts performed another nerve block.  Id.

In applying the Eleventh Circuit's pain standard, the ALJ found that the plaintiff has medically determinable impairments that could reasonably be expected to produce her alleged symptoms, but that her statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with his residual functional capacity assessment.  [R. 17].   This conclusion is not supported by substantial evidence.  In his decision, the ALJ stated:

> The claimant also contends she is disabled due to severe leg pain.  However, the alleged severity of her leg pain is not supported by the medical evidence.  Treatment records from Tennessee Valley Pain Consultants show the claimant ambulated with a steady gait and the record does not show she required an assistive device to ambulate.  In June 2009, Dr. Beck noted [her] range of motion in the lumbar spine was normal and all muscles tested were within normal range.  An MRI of the lumbar spine was essentially normal in appearance and there was no evidence of central canal stenosis or disc herniation (See Exhibit 20F).  X-rays of the knee were also within normal limits.  The claimant testified the pain in her legs was a 9 on a scale of one to ten and that she had to elevate her legs every ten to fifteen minutes.  However, treatment records from SportsMed Orthopaedic show the claimant exhibited no pain behavior.  The undersigned acknowledges the claimant has been diagnosed and treated for peripheral neuropathy.  However, the objective medical evidence does not substantiate the level of pain alleged.  Further, the record shows the claimant reported she was happy with the results of physical therapy and she felt her condition had improved.  On a visit to the Tennessee Valley Pain consultants, the claimant was alert and oriented x 3, [and] her gait was steady.  The claimant complained of neuropathic pain, but denied fevers, fatigue, [and] malaise.  There was no joint stiffness, pain, and no restrictions.  (Exhibit 26F).  However, the claimant saw Dr. Harry W. Schroeder, Jr., on 11/9/2009, where the claimant complained of chronic fatigue, incontinence, arthritis in fingers, the left hip, left ankle, [and] right knee.  However, he described the claimant [as] well developed, well nourished, [and] in no acute distress.  An examination by Dr. Eric R. Beck on 12/21/2009 (Exhibit 19F) reveals that the claimant was well developed, [and] in no acute distress.  She had fair to good single leg stance on the left and good on the right.  She could toe and heel walk.  In addition, the range of motion in the hip, knee, forefoot and

> ankle were [within a] normal range of motion.  The undersigned assigns
> some credibility to the claimant's complaints and such are reflected in the
> residual functional capacity.

[R. 17-18](emphasis added).  As stated earlier, in this circuit medical evidence of pain

itself, or of its intensity, is not required.  Based upon the medical evidence of record, the

plaintiff has unquestionably met the Eleventh Circuit's pain standard.

One of the ALJ's stated reasons for doubting the plaintiff's pain testimony

is that her pain management doctors noted that she ambulated with a steady gate and did

not use an assistive device. [R. 17].  However, the records also show that the plaintiff

complained of a balance problem, had a marked atrophy in her left leg, and a history of

instability. [R. 405].  The ALJ also stated that the plaintiff "reported she was happy with

the results of physical therapy and she felt her condition had improved." [R. 18].  While it

is true the plaintiff thought physical therapy had improved her balance, it is also clear that

she continued to complain of severe pain.

Moreover, the medical evidence shows a "longitudinal history of

complaints and attempts at relief" that support the plaintiff's pain allegations.  See SSR

96-7P 1996 WL 374186 at *7 ("In general, a longitudinal medical record demonstrating

an individual's attempts to seek medical treatment for pain or other symptoms and to

follow that treatment once it is prescribed lends support to an individual's allegations of

intense or persistent pain or other symptoms for the purposes of judging the credibility of

the individual's statements.").  As Judge Allgood observed in Lamb v. Bowen:  "[T]he

record is replete with evidence of a medical condition that could reasonably be expected

to produce the alleged pain.  No examining physician ever questioned the existence of appellant's pain.  They simply found themselves unable to cure the pain."  847 F.2d 698 (11th Cir. 1988).

       With this standard in mind, it is clear that the ALJ's articulated reasons for rejecting the plaintiff's pain testimony are not supported by substantial evidence. Therefore, the ALJ failed to satisfy the requirements of Hale.  The conclusion of that court is equally appropriate in the instant case.  "[T]he Secretary has articulated reasons for refusing to credit the claimant's pain testimony, but none of these reasons is supported by substantial evidence.  It follows, therefore, that claimant's pain testimony has been accepted as true."  Hale, at 1012.

       The plaintiff testified that she could sit for 10 minutes and stand for 10 minutes at a time. [R. 36].  She described her pain as a "shooting pain from like my bottom of my feet up to like above my knee." [R. 38].  She testified that the pain is always there.  Id.  She testified that in an attempt to relieve her pain, she elevates her legs every 10 to 15 minutes, keeping them elevated for 20 to 30 minutes. [R. 40].  The plaintiff also testified that because of her fatigue, she naps during the day for about four hours. [R. 46]. At the hearing, the vocational expert testified that if a person had to elevate her legs for 20 to 30 minutes after standing or sitting for 10 minutes, she could not perform any work that exists in the regional or national economy. [R. 68]. The VE also testified that a person who had to recline or rest for four hours during a day would also not be able to

work in the regional or national economy. [R. 70].   Taking the plaintiff's testimony as true, the VE's testimony establishes disability without a doubt.

## CONCLUSION

Therefore, the Commissioner failed to carry his burden at step five of showing the plaintiff could perform other work.  Accordingly, the plaintiff is disabled within the meaning of the Social Security Act.  An appropriate order remanding the action with instructions that the plaintiff be awarded the benefits claimed will be entered contemporaneously herewith.

DONE and ORDERED 11 July 2012.


UNITED STATES DISTRICT JUDGE
J. FOY GUIN, JR.